IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BONNIE S. LARSEN, an Individual, | ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Trial By Jury Demanded** |
| | ) | |
| NEBRASKA ENERGY FEDERAL CREDIT UNION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

COMES NOW the Plaintiff through her counsel of record, Michael J. Merrick of Merrick Law Firm LLC, and for her Complaint against Defendant states as follows:

### NATURE OF THE ACTION

1. Plaintiff Bonnie Larsen worked for the Defendant credit union for nearly 27 years. In March of 2020 she submitted a complaint to the board of directors that the CEO was harassing her because of her age. An investigation conducted by a third-party revealed that multiple other current and former employees also believed the CEO had harassed Plaintiff and them because of their age which drove several of them out of the credit union and caused a number of them to have to take anti-anxiety and anti-depressant medications. Nevertheless, the credit union allowed the CEO to continue to harass and retaliate against Plaintiff which caused her to have to take a lengthy medical leave of absence due to the workplace stress. The credit union abruptly terminated her employment two days before she was scheduled to return to work. Plaintiff brings this wrongful termination action under the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Nebraska Age Discrimination in Employment Act and the Nebraska Fair Employment Practices Act.

**JURISDICTION & VENUE**

2. Subject matter jurisdiction is premised on the federal question jurisdiction, 28 U.S.C. § 1331, as Plaintiff's claims under the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* ("ADEA") and the Americans with Disabilities Act, as amended by the Americans With Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 *et seq.* ("ADA") arise under federal law. This Court has supplemental jurisdiction over Plaintiff's Nebraska Age Discrimination in Employment Act, Neb. Rev. Stat. §48-1001 *et seq.* ("NADEA") and Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §48-1101 *et seq.* ("NFEPA") claims under 28 U.S.C. §1367.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2002e-5(f)(3) as Defendant has employees and does business in this judicial district, a substantial part of the events or omissions giving rise to these claims occurred in this judicial district, and Plaintiff would have remained employed in this judicial district but for the unlawful employment practices alleged herein.

**PARTIES**

4. Plaintiff Bonnie S. Larsen ("Larsen") is a citizen of the United States and at all relevant times was employed by Defendant at its offices at 1414 15th Street in Columbus, Nebraska.

5. Defendant Nebraska Energy Federal Credit Union ("Credit Union" or "Defendant") is a federal credit union located in Columbus, Nebraska doing business in Nebraska, South Dakota, Wyoming and Colorado.

**COMMON ALLEGATIONS**

6. Larsen is 63 years old.

7. In or about June 1994 she commenced employment with the Credit Union as a Member Service Representative

8. In or about April 1998 the Credit Union promoted Larsen to the Consumer Loan Department as a Consumer Loan Officer.

9. In or about October 2010 the Credit Union promoted Larsen to the Mortgage Lending Department as a Mortgage Loan Officer.

10. At all times Larsen met or exceeded the Credit Union's legitimate work performance expectations. Larsen never had a customer complaint during her nearly 27-year career with the Credit Union.

11. Beginning in or about November 2016 after Larsen returned from personal time off, Julie Haney, the Credit Union's President and CEO ("Haney"), began discriminating against her and harassing her because of her age.

12. Haney treated Larsen in an extremely disrespectful manner, micromanaged her, gave her nearly impossible workloads, excluded her from meetings, constantly changed expectations, took away job responsibilities, turned her down for positions she was well-qualified for and instead hired substantially younger and less experienced individuals from outside the organization, and deprived her of learning opportunities such as attending seminars while allowing substantially younger employees to attend. Haney's discrimination and harassment of Larsen got progressively worse over the years.

13. Haney also discriminated against and harassed other older employees to force them out of the Credit Union.

14. On or about March 17, 2020 Larsen sent a written complaint of age discrimination and harassment by Haney to the Credit Union's Board of Directors.

15. On or about March 20, 2020 Ed Wagner, Co-Chair of the Credit Union's Board of Directors ("Wagner"), called Larsen and told her he wanted to set up a meeting with him, Larsen and Haney.

16. Larsen told Wagner that she did not want to meet with Haney because her complaint was against Haney.

17. Wagner shared a copy of Larsen's complaint with Haney.

18. On or about March 22, 2020, Wagner called Larsen and told her he would set up a meeting with him, Larsen, and some of the other Credit Union Board members.

19. On or about March 25, 2020 Larsen attended a meeting with Board members Wagner, Clint Przymus, Co-Chair Nikki Schultz ("Schultz") and Jenny Hoeffer to discuss Larsen's complaint.

20. During the meeting the Board members asked Larsen to write an addendum to her complaint explaining how the situation had affected her personally, how she had tried to resolve it herself and what she thought the solution was.

21. Haney was noticeably upset after Wagner advised her that Larsen had sent the age discrimination complaint letter. Haney either ignored Larsen or was very short when she had to communicate with her.

22. On or about March 26, 2020 Wagner told Larsen that the Board decided to have a neutral third-party investigate her complaint of age discrimination.

23. The Credit Union assured Larsen that it was taking her complaint very seriously and that any retaliation would not be tolerated.

24. The Credit Union hired the law firm of Jackson Lewis, P.C. ("Jackson Lewis") to conduct a workplace investigation in response to Larsen's complaint.

25. Larsen and other current and former Credit Union employees were subsequently interviewed by a Jackson Lewis attorney.

26. Larsen was not the only witness who believed Haney discriminated against her because of her age.

27. Jackson Lewis sent a report ("Report") of its investigation dated April 13, 2020 to Wagner.

28. The Report states "that there appears to be a number of current and former employees who believe that Larsen and they have been treated badly by Haney and note that those who are subjected to this treatment report that they are older women employed by the Credit Union."

29. The Report further states that "there is a pervasive culture of fear and belief by many staff members that Haney treats them in an inappropriate and demeaning manner. These staff members believe that they are treated differently than younger workers at the Credit Union."

30. The Report further states that multiple employees "reported that Haney is disrespectful to Larsen and to them as well. All of these witnesses reported a belief that they were all treated harshly because they were older workers."

31. The Report further states that multiple employees "reported that Haney's behavior at times is bullying, degrading and disrespectful" and that all but one employee "reported that they personally have been extremely stressed by Haney's behavior, many to the point of dreading work beginning the night before."

32. The Report further states that multiple current and former employees "describe similar patterns of aggressive criticism, instances of mocking or belittling someone and yelling at them, resulting in fear, depression and anxiety."

33. The Report further states that one employee "reported that four out of the six people on her team are currently taking depression and anxiety medications due to workplace stress," and that multiple employees "chose to retire to get away from the stress" and still others "feel trapped and have nowhere else to go."

34. The Report further states that the witnesses were "credible with regard to the negative, demeaning, and demoralizing nature of Haney's behavior toward them" and that "the two consistent threads in all of the interviews support that Haney does belittle and demean the staff to the point that they are fearful of her and equally fearful of reporting their concerns."

35. The Report concludes that while the investigation "was unable to substantiate Larsen's allegations tied to her age or use of leave time, there appears to be a culture of fear and negative performance pressure resulting in high stress and frustration at the credit Union brought about by Haney's harsh and sometimes bullying management style."

36. Nevertheless, the Report did not recommend that any disciplinary action be taken against Haney for her misconduct or the resulting serious physical and mental harm done to Larsen and the Credit Union's other employees.

37. Instead, the Report recommended providing Haney the benefit of corrective measures, including hiring an executive coach for her.

38. At all relevant times the Credit Union had a policy in place that purportedly provided that it had zero tolerance for discrimination, harassment or bullying of any kind.

39. Nevertheless, the Credit Union did not fire Haney or, upon information and belief, give her any discipline whatsoever for her severe mistreatment of the current and former employees and the resulting harm inflicted upon them as described in the Report.

40. The Report also recommended "instituting a safe procedure for staff to report their concerns about the CEO to the board or to another member of the staff who is entrusted with taking appropriate responsive action to ensure that the concerns are properly investigated and addressed" because at that time "the CEO [Haney] controls all such communication and processes directly leaving little opportunity for recourse."

41. On or about April 22, 2020, Wagner told Larsen the Board would have a meeting with Larsen and Haney to announce the results of the investigation. After Larsen asked why Haney had to attend the meeting with her, Wagner subsequently advised her that Haney would not be attending.

42. Larsen subsequently emailed the Jackson Lewis lawyer who had interviewed her, Wagner, and all other members of the Board an addendum to her written statement describing how Haney had retaliated against Larsen after finding out about her complaint of age discrimination.

43. Upon information and belief, Wagner gave a copy of Larsen's addendum to Haney or showed it to her.

44. On or about April 23, 2020 Larsen met with Wagner, Schultz, and the Jackson Lewis lawyer who had interviewed her.

45. Wagner handed Larsen a letter dated April 22, 2020 purporting to summarize the results of the investigation. The letter states in part that "[t]hough the investigation could not substantiate all of your allegations, we believe the investigation did reveal behavior that violates our policies."

46. Wagner's letter further states that "I can tell you that the appropriate action has been taken to ensure that such reported conduct does not repeat itself. Should you experience any further problems, please immediately let me know or speak with another trusted member of the

7

Board of Directors. Any future misconduct, including any retaliation, will be dealt with swiftly and in a manner that the circumstances dictate."

47. On or about May 8, 2020 Larsen emailed the Board questioning why Haney was allowed to move forward, with the Board's assistance and apparently without suffering any consequences, after having been found in violation of the organization's policies with respect to her conduct towards Larsen and others.

48. On or about July 16, 2020 Larsen emailed the Board to advise the members that nothing had changed and that Haney continued to discriminate and harass Larsen because of her age.

49. On or about July 17, 2020 Wagner emailed Larsen asking if her July 16 complaint involved new issues or were part of her earlier complaint. Wagner stated that he was reluctant to have a meeting with the Board unless these were new issues.

50. Larsen emailed Wagner and assured him that they were new issues. She informed him that things were not getting any better, and that she was hoping to see more positives than negatives four months after she had initially complained but the work environment was getting worse and it was affecting her health.

51. On or about July 19, 2020 Wagner emailed Larsen stating that he would schedule a meeting for her to discuss her recent complaint but he wanted Haney to attend the meeting. He stated that was the only way to remedy the situation.

52. On or about July 21, 2020 Larsen emailed Wagner agreeing to a meeting with Haney present but asked for an opportunity to talk to the Board about some confidential matters first.

53. On or about July 23, 2020 Wagner emailed Larsen stating:

> **I want to reiterate that any meeting we have with you on this matter must include the CEO**. The board addressed your issues with an outside consultant and informed you of the findings associated with your concerns. We believe any resolution MUST include the CEO. She is responsible for all matters related to the operation of the credit union and resolving any staff issues.
>
> I would agree to invite a couple other board members to meet with you and JULIE [Haney] if you are still interested in that format. Please advise if you want to proceed with these ground rules. (bold and caps in original).

54. Wagner advised Larsen that the Board would work with Haney to address Larsen's concerns.

55. Larsen was concerned because the employee handbook states that if a complaint involves the President the employee should bring it to the Board's attention, and it now seemed like the Board was empowering Haney to do whatever she wanted.

56. On or about July 27, 2020 Larsen met with Wagner, Haney and other Board members to discuss her recent complaint against Haney. Wagner asked Larsen what she wanted from Haney.

57. Larsen replied to Haney, "I want you to treat me the way you want to be treated and just let me do my work."

58. After the meeting, Haney's harassment of Larsen continued and got worse.

59. On or about July 29, 2020 Larsen emailed the Board with some concerns, including that her annual performance review was past due.

60. On July 31, 2020 Haney and Wagner met with Larsen and gave her her annual performance review which was mostly negative.

61. Haney had given Larsen a positive review in 2019.

9

62. Haney told Larsen that she was going to put Larsen on a performance improvement plan ("PIP") to address her alleged performance problems which Haney claimed had been going on "for years."

63. On or about August 19, 2020 Haney and Wagner met with Larsen and gave her a 60-day PIP.

64. Larsen subsequently signed the PIP and noted that she did not agree with it and that she believed she was being retaliated against for complaining about age discrimination.

65. This was the first time Larsen had been given a PIP.

66. Upon information and belief, this was the first time Haney had ever put any Credit Union employee on a PIP.

67. Under the terms of the PIP Larsen was supposed to get weekly feedback and training to help her improve.

68. Haney did not have any weekly meetings or provide Larsen with any training during the 60 days that followed.

69. In or about September 2020, the Credit Union hired a Human Resources Manager, Susan Martin ("Martin"), and a Vice President of Lending, Daniel Stejskal ("Stejskal"), who became Larsen's and the other mortgage and consumer loan officers' direct supervisor.

70. Nevertheless, Haney continued to directly monitor Larsen and remained involved in the PIP process. Stejskal was not included in any PIP meetings.

71. On or about October 14, 2020 Haney, Martin, Wagner, and Schultz met with Larsen for her 60-day PIP meeting. Larsen's supervisor, Stejskal, did not attend the meeting.

72. Haney began the meeting by acknowledging that Larsen had noted on the PIP document that she believed the PIP was retaliatory.

73. Larsen told the group that she did believe the PIP was retaliatory, that Haney was constantly targeting her, that she set higher expectations for her than her co-workers, and that she believed Haney was targeting Larsen and other older employees too.

74. Larsen also noted that she had not received any feedback or training which they assured her she would receive when the PIP was initially given to her.

75. At the end of the meeting Haney said she would extend the PIP for another 30 days and start meeting with Larsen weekly.

76. Haney also required Larsen to document in a spreadsheet everything she did every minute of every workday and what she planned to do the next day and send it to her by 5:00 p.m. each day.

77. Haney then met with Larsen and picked apart most everything listed in the spreadsheet. For example, Haney asked Larsen why she was on hold during a particular phone call and wanted to know what she was doing while she was on hold.

78. For another example, Haney chastised Larsen for taking time to reboot her computer after it had frozen up.

79. This hyper-micromanagement was enormously time consuming which made Larsen's job even more stressful. Larsen asked for a meeting with Martin and Stejskal.

80. On or about December 21, 2020, Larsen met with Martin and Stejskal and told them the situation with Haney was not getting any better and that she was still discriminating and retaliating against her which was affecting her ability to think straight.

81. Larsen broke down emotionally during the meeting and pleaded for Martin and Stejskal to contact the Board for help.

82. On or about January 6, 2021, Larsen emailed Haney, Martin and Stejskal a request for a medical leave of absence for eight weeks to begin on January 11, 2021 due to mental and physical conditions caused by the work stress.

83. These mental and physical conditions constitute a disability as defined by the ADA.

84. On or about January 7, 2021, Martin and Stejskal met with Larsen about her request for medical leave. Martin told Larsen that they wanted to make sure she was okay, and they wanted her medical leave to start immediately.

85. During that meeting Larsen asked them if they had contacted the Board for help as she had requested previously.

86. Martin stated that they did not relay her complaint and request for help to the Board.

87. Martin asked Larsen to check in with her about a week before she was set to return to work. Larsen told her she would do so.

88. On or about February 24, 2021, Larsen emailed Haney, Martin and Stejskal to advise them that her physician had extended her medical leave through March 31, 2021. Stejskal responded, "Thanks for this and take care of yourself." Haney and Martin did not respond.

89. On or about March 6, 2021 Larsen, through counsel, emailed Wagner a letter advising him that Haney's age discrimination and harassment had continued and that she had engaged in retaliatory conduct against Larsen.

90. The letter further advised Wagner that "I believe our mutual goal should be to protect [Larsen's] physical and mental health when she returns to work and ensure that she returns to an environment free of age discrimination and retaliation. I look forward to working with the Board to achieve this goal."

91. Wagner did not respond to the letter.

92. On or about March 18, 2021, Larsen emailed Haney, Martin and Stejskal to let them know that she was on schedule to return to work on April 1, 2021. None of them replied to her email.

93. On or about March 29, 2021, Larsen emailed Haney, Martin and Stejskal again to remind them of her April 1, 2021 return to work date, and asked them if she would need a medical release from her physician. None of them replied to her email.

94. On or about March 30, 2021, an attorney for the Credit Union emailed Larsen, through counsel, stating that her employment was terminated effective immediately because her work performance had not improved. The Credit Union's stated reason is a pretext.

95. The Credit Union purported to fire Larsen for alleged unsatisfactory work performance even though management knew she was on a medical leave of absence due to work-related stress.

96. Larsen subsequently filed a charge of age and disability discrimination and retaliation ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Nebraska Equal Opportunity Commission, and has received a Notice of Right to Sue from the EEOC.

97. The Credit Union advised the EEOC that Larsen's complaints of age discrimination and retaliation against Haney were not sincere. That allegation is false.

98. The Credit Union falsely told the EEOC that Larsen was simply trying "a new tactic to avoid Haney's attempts to secure better performance from her—involving the Board of Directors by making a number of complaints about Haney."

99. The Credit Union also represented to the EEOC that the investigation of Larsen's complaints had discovered "no evidence of discrimination against [Larsen] or other employees

based on their age," even though Larsen and multiple other current and former employee-witnesses told the Credit Union that they believed Haney had severely mistreated Ms. Larsen and other older employees because of their age.

100. The Credit Union did not genuinely attempt to prevent and promptly stop age discrimination in the workplace.

## COUNT I

### ADEA AGE DISCRIMINATION/WRONGFUL TERMINATION

101. Larsen performed reasonably in her job in accordance with Defendant's legitimate expectations.

102. Defendant terminated Larsen's employment because of her age.

103. Defendant treated younger employees more favorably than Larsen.

104. Upon information and belief, Defendant replaced Larsen with a substantially younger employee.

105. Defendant terminated Larsen's employment in willful violation of the ADEA.

106. As a proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT II

### NADEA AGE DISCRIMINATION/WRONGFUL TERMINATION

107. Plaintiff incorporates by reference paragraphs 1 through 106 as though fully set out in this Count II.

108. Defendant's termination of Larsen because of her age is also a violation of the NADEA.

109. As a proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT III

## ADEA RETALIATION

110. Plaintiff incorporates by reference paragraphs 1 through 106 as though fully set out in this Count III.

111. Larsen engaged in protected conduct by complaining to management about age discrimination and retaliation multiple times.

112. Defendant retaliated against Larsen because of her complaints by harassing her and terminating her employment.

113. Defendant's retaliatory conduct was done in willful violation of the ADEA.

114. As a proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT IV

## NADEA RETALIATION

115. Plaintiff incorporates by reference paragraphs 1 through 114 as though fully set out in this Count IV.

116. Defendant's retaliation against Larsen because of her complaints is also a violation of the NADEA.

117. As a proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT V

## ADEA HOSTILE WORK ENVIRONMENT

118. Plaintiff incorporates by reference paragraphs 1 through 106 and 111 through 114 as though fully set out in this Count V.

119. Larsen and other older current and former employees found Haney's harassment of them to be offensive and unwelcome.

120. Haney's harassment and retaliation made it so difficult for Larsen to do her job so as to alter the terms and conditions of her employment.

121. Larsen repeatedly complained to management about the harassment and retaliation, but Defendant did not take action to make the harassment and retaliation stop.

122. The hostile work environment culminated in the termination of Ms. Larsen's employment.

123. Larsen would not have been subject to Haney's harassment had she not been an older employee.

124. Defendant fostered a work environment hostile to Larsen and the other older employees and did so in willful violation of the ADEA.

125. As a proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## VI

### NADEA HOSTILE WORK ENVIROMENT

126. Plaintiff incorporates by reference paragraphs 1 through 125 as though fully set out in this Count VI.

127. Defendant fostered a work environment hostile to Larsen and the other older employees and did so in willful violation of the NADEA.

128. As a proximate result Larsen suffered damages.

### COUNT VII

### ADA DISABILITY DISCRIMINATION/INTERFERENCE

129. Plaintiff incorporates by reference paragraphs 1 through 100 as though fully set out in this Count VII.

130. At all relevant times Larsen suffered from a mental impairment as defined by the ADA which was caused and/or exacerbated by the hostile work environment.

131. Larsen's impairment substantially limited multiple major life activities including, but not limited to, concentrating, thinking and working.

132. Larsen's impairment also substantially limited the operation of major bodily functions including, but not limited to, the brain function.

133. Larsen's impairment constitutes an actual disability as defined by the ADA.

134. Larsen also has a record, or history, of having an impairment that substantially limits one or more of the major life activities described above.

135. Defendant also regarded Larsen as having the impairment described above.

136. At all relevant times Larsen possessed the necessary education, skill, experience and all other requirements for the position she held with Defendant and she was able to perform the essential functions of her position, with or without a reasonable accommodation, at the time Defendant terminated her employment.

137. At all relevant times Larsen was a qualified individual with a disability as defined by the ADA.

138. Defendant was aware of Larsen's impairment and believed it substantially limited one or more major life activities.

139. Defendant terminated Larsen's employment because of her disability.

140. Defendant violated the ADA by interfering with Larsen's ability to take medical leave and return therefrom and by terminating her employment because she has an actual disability, has a record of having a disability, and/or Defendant regarded her as having a disability.

141. Defendant acted with malice and reckless indifference to Larsen's federally-protected rights.

142. As a direct and proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT VIII

### NFEPA DISABILITY DISCRIMINATION & INTERFERENCE

143. Plaintiff incorporates by reference paragraphs 1 through 100 and 130 through 142 as though fully set forth in this Count VIII.

144. Defendant violated the NFEPA by interfering with Larsen's ability to take medical leave and return work therefrom and by terminating her employment because she has an actual disability, has a record of having a disability, and/or Defendant regarded her as having a disability.

145. As a direct and proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT IX

### ADA RETALIATION

146. Plaintiff incorporates by reference paragraphs 1 through 100 and 130 through 142 as though fully set forth in this Count IX.

147. Defendant retaliated against Larsen for exercising her rights under the ADA by terminating her employment because she had requested and took medical leave for her disability which was a reasonable accommodation under the ADA.

148. Defendant acted with malice and reckless indifference to Larsen's federally-protected rights.

149. As a direct and proximate result of Defendant's unlawful conduct, Larsen suffered damages.

## COUNT X

## NFEPA RETALIATION

150. Plaintiff incorporates by reference paragraphs 1 through 100 and 130 through 149 as though fully set forth in this Count X.

151. Defendant retaliated against Larsen for exercising her rights under the NFEPA by terminating her employment because she requested and took medical leave for her disability which was a reasonable accommodation under the NFEPA.

152. As a direct and proximate result of Defendant's unlawful conduct, Larsen suffered damages.

**WHEREFORE**, Plaintiff respectfully prays for judgment in her favor and against Defendant on all counts and for the following make-whole relief:

A. Preliminary and permanent injunctions enjoining Defendant from unlawfully discriminating or retaliating against Plaintiff and interfering with her employment;

B. Lost past and future wages and benefits in an amount to be proven at trial;

C. Compensatory damages in an amount to be proven at trial;

D. Liquidated damages;

E. Punitive damages;

F. Interest;

G. A tax offset award;

H. Other equitable relief including back pay, reinstatement and/or front pay;

I. Plaintiff's reasonable attorneys' fees and costs incurred herein; and

J. For such further relief that the Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury.

## REQUEST FOR PLACE OF TRIAL

Plaintiff requests Omaha as the place for trial.

BONNIE S. LARSEN

By: /s/Michael J. Merrick
Attorney No. 19855

Michael J. Merrick
Merrick Law Firm LLC
1004 Farnam Street, Suite 103
Omaha, Nebraska 68102
Tel. (402) 933-4256
Fax (402) 513-6504
merrick@merricklawfirm.com

*Attorney for Plaintiff*